**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000153
20-JAN-2012
08:11 AM**

NO. CAAP-11-0000153

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


IN THE INTEREST OF M. CHILDREN: BM

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 08-11988)


SUMMARY DISPOSITION ORDER
(By: Nakamura, Chief Judge, Fujise and Leonard, JJ.)


Mother-Appellant appeals from the Decision Re: Trial, filed on February 23, 2011, and the Order Terminating Parental Rights, filed on March 8, 2011, terminating her parental and custodial rights over B.M., both of which were entered by the Family Court of the First Circuit (**Family Court**).[1]

I.    BACKGROUND

Initial contact in this case commenced with the Department of Human Services (**DHS**) petitioning for foster custody of B.M. and her younger brother (**Brother**) on October 1, 2008, based on an unjustifiably explained fracture of two-month-old Brother's right humerous, and noting a 2006 Navy Family Advocacy Program intervention substantiating neglect based upon Mother's methadone abuse. On December 18, 2008, DHS was awarded foster custody over the children. After services and reviews, effective February 25, 2009, the DHS foster custody was revoked, and DHS family supervision was implemented, with Father being found to be

_____

[1]  The Honorable Linda K.C. Luke presided.

willing and able to provide a safe family home with a service plan, and where mother, at that time, was not in the home, but was in the Big Island Recovery program. On April 20, 2009, Mother was permitted to return to the family home under DHS family supervision, but not permitted to be alone with the children.

On September 18, 2009, Father took B.M. to school, with Mother at home, and later admitted that he left Brother at home sleeping. After Father returned home because he had forgotten B.M.'s shoes, he then took Brother with him. Father returned home and placed Brother in bed, and went to sleep; then Father awoke 15-25 minutes later and found Brother to be unresponsive. It was later determined that Brother suffered a subarachnoid hemorrhage and subdural hemorrhage and brain swelling. Injuries were due to "severe accelerative/decelerative rotational forces applied to the child's head, as a forceful shaking and impact." Brother died on September 20, 2009. The September 21, 2009 autopsy report concluded that Brother's death was "as a result of intracranial injury due to abusive head trauma[,]" and injury "could have been caused by shaking and/or impact." Foster custody was assumed by DHS on September 18, 2009 and ultimately the November 24, 2009 Family Service Plan was ordered.

The permanency trial was conducted on January 25-26, 2011. On February 23, 2011, the Family Court issued the Decision Re: Trial, which granted DHS's motion for permanent custody, and on March 8, 2011, the Family Court issued the Order Terminating Parental Rights. The Family Court issued Findings of Fact and Conclusions of Law on April 12, 2011 and Amended Findings of Fact and Conclusions of Law on April 15, 2012.

On appeal, Mother asserts that clear and convincing evidence did not exist that Mother was unable and unwilling to provide a safe home for B.M., considering: (1) violation of her right of due process where Mother was misled into believing that

the trial would not include allegations that she caused the death of Brother and the Family Court's erroneous determination that the Navy Criminal Investigative Services' (**NCIS**) documents were admissible for the truth of the matters reflected therein; (2) failure of DHS to provide Mother a reasonable opportunity to reunite with B.M. by failing to provide Mother with services in Texas and that the Family Court erroneously found that Mother failed to comply with the service plan; and (3) the Family Court's erroneous findings of fact (**FOFs**) that Mother abused methadone while pregnant with B.M. and that Mother admitted to recreational use of methadone in Texas.

II.  DISCUSSION

Mother asserts that her due process rights were violated where she was misled by DHS's pretrial statement into believing that the trial would not include allegations that she caused the death of Brother, that no opportunity to continue the trial existed to prepare for DHS's change in position, and that the Family Court erroneously ruled that the NCIS documents, which related to the investigation of Brother's death, could be utilized for the truth of the matters asserted therein.

Review of the pretrial proceedings reflect that Mother's belief that the issue of the perpetrator of harm to Brother would not be raised during trial was without basis. DHS's first pretrial statement on October 4, 2010 [DHS's First Pretrial Statement] included the following statement.

> . . . . DHS position is [Brother's] death was due to physical abuse by his Father; that Mother failed to adequately care for her children and/or supervise or monitor [Brother] . . . . .

DHS's First Pretrial Statement also noted that discovery was needed of the "military investigation into [Brother's] death[,]" and requested a stipulation that Brother "died while in the care and custody of parents." DHS's supplemental pretrial statement filed on December 14, 2010, listed witnesses from NCIS regarding

testimony as to "knowledge of the family and their investigation into the death of [Brother]."

At a pretrial hearing on December 14, 2010, after discussion regarding information contained in the NCIS reports and mother's concerns about use of NCIS records focusing on the criminal aspect of Brother's death, the court stated, in pertinent part, as follows:

> The indication I'm giving now is that the perpetrator -- the determination of the perpetrator of harm is relevant to whether or not the services were appropriate, whether or not progress has been made, and whether or not parents can provide a safe family home.

DHS's second supplemental pretrial statement filed on January 10, 2011 reflected, in relevant part as follows.

> [T]he number of witnesses may be reduced depending upon 1) parents request for report writers, 2) if parents will be testifying and if they do, if they will be invoking their fifth amendment rights as to questions related to the death of [Brother], and depending upon their testimony, 3) whether any stipulations can be entered into including but not limited to the facts and circumstances of the: bruises and injuries to [Brother] in 2009, days prior to and after 9/17/09 to 9/19/10[.]

At the January 12, 2011 pretrial hearing, Father's counsel stated, in part:

> I wanna make certain that everyone, including the court, understands that this is a motion to terminate parental rights. The issue is not finding out who harmed a child, but finding out whether or not the parents can provide a safe home for the child.

At trial, when the issue again arose, the Family Court stated, in pertinent part, as follows.

> . . . in reviewing page 2 of the Department's October 4th pretrial statement, it also indicates the allegation that mother failed to adequately care for her children and supervise or monitor [Brother] and that she cannot be protective of [B.M.].

> So given that, [Mother's Counsel], I cannot excerpt or exorcise [sic] from the scope of this court's fact finding the circumstances of [Brother]'s demise. So I think if you need to talk to your client, we can take a ten-minute recess, because the choice is yours.

4

The record also reflects that Mother declined to take advantage of a continuance of trial offered by the Family Court in order to review the transcripts to support her argument although, as demonstrated above, such a review would not have yielded the information she desired.

Relatedly, Mother takes issue with the Family Court's evidentiary determination that certain documents were admissible and could be considered for the truth of the matter reflected therein. Mother stipulated to the admission of all of DHS's trial exhibits, which included the NCIS documents, and no limitation was placed on the stipulation. Consequently, the Family Court's determination that exhibits in evidence could be considered for the truth of the matter asserted was not error.

Mother contends that DHS failed to provide Mother a reasonable opportunity to reunite with B.M. by failing to provide Mother with services in Texas, and that the Family Court erroneously found that Mother failed to comply with the service plan (citing FOF 62).[2/]

The record reflects that Mother was provided numerous services in Hawai'i, moved to Texas in contravention of the order of the Family Court, failed to maintain contact with DHS, and did not attempt to participate in the family plan while in Texas. Moreover, Mother does not point to anywhere in the record where she objected to the November 24, 2009 service plan or, prior to trial, brought attention to a lack of services while in Texas.

Consequently, Mother was not deprived of due process where no substantial prejudice accrued to Mother in light of

---

[2]    FOF 62 states:

> Mother failed to comply with her service plan dated November
> 24, 2009 as Mother failed to complete a domestic violence
> program. There was domestic violence throughout parents'
> marriage which continued up and to the time of [Brother's]
> death. Parents also had a history of marital discord from
> the time of their involvement with CWS in Texas, culminating
> in their divorce.

sufficient evidence that DHS made reasonable efforts to reunify, consistent with In re Doe, 100 Hawai'i 335, 343-44, 60 P.3d 285, 293-94 (2002).

Mother contests the Family Court's FOFs that Mother abused methadone while pregnant with B.M. (citing FOF 18)[3/] and that Mother admitted to recreational use of methadone in Texas (citing FOF 19).[4/] DHS's Exhibit 17, which was stipulated into evidence without reservation, provides evidence to the contrary. Thus, the Family Court's findings were not clearly erroneous.

---

[3]    FOF 18 states:

Parents had a case with the Navy Family Advocacy Program in Texas from October 2006 which closed in August 2007 due to allegations of physical abuse to the child. The child was 3 months old at the time. Neglect of the child was substantiated in January 2007. Substance abuse is a factor in the case as Mother was abusing Methadone while she was pregnant with the child.

[4]    FOF 19 states:

Parents had a child welfare case in Texas in 2006 - 2007 which started when Mother was found asleep in her car in a Walmart parking lot with the child. Mother admitted to daily recreational use of methadone. The child was exposed to methadone as Mother admitted using methadone while pregnant with the child. Mother admitted she was addicted to methadone. The child welfare authorities in Texas found that there was a substantial risk of further neglectful supervision of the child due to Mother's drug use. Child welfare services in Texas found that the actions of Mother constituted a continuing danger to the child and it was not in the best interest of the child to remain with Mother. The child was removed from Mother's care and placed with relatives. During the course of the Texas child welfare case, Mother refused to participate in a residential substance abuse program.

For the foregoing reasons, we affirm the Family Court's Decision Re: Trial, filed on February 23, 2011, and Order Terminating Parental Rights, filed on March 8, 2011.

DATED: Honlulu, Hawai'i, January 20, 2012.

On the briefs:

Herbert Y. Hamada
for Mother-Appellant

Robert T. Nakatsuji
Deputy Solicitor General
Department of the Attorney General
for Petitioner-Appellee
Department of Human Services

Chief Judge

Associate Judge

Associate Judge